IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| RONALD P.,[1] | ) |
| | ) Civil Action No. 7:23-CV-00165 |
| Plaintiff, | ) |
| | ) |
| v. | ) REPORT AND RECOMMENDATION |
| | ) |
| MARTIN O'MALLEY,[2] | ) |
| Commissioner of Social Security, | ) By: C. Kailani Memmer |
| | ) United States Magistrate Judge |
| Defendant. | ) |

Plaintiff Ronald P. ("Ronald") filed this action challenging the final decision of the Commissioner of Social Security ("Commissioner") finding him not disabled and therefore ineligible for supplemental security income ("SSI") under the Social Security Act ("Act"). 42 U.S.C. §§ 1381–1383f. Jurisdiction of this court is pursuant to 42 U.S.C. § 1383(c)(3). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). ECF No. 18. As directed by the order of referral, the undersigned now submits the following report and recommended disposition. Neither party has requested oral argument; therefore, this case is ripe for decision.

For the reasons detailed below, I recommend **AFFIRMING** the Commissioner's final decision denying Ronald's SSI claim and **DISMISSING** this case from the Court's active docket.

**STANDARD OF REVIEW**

The court limits its review to a determination of whether substantial evidence exists to support the Commissioner's conclusion that Ronald failed to demonstrate that he was disabled

---

[1] Due to privacy concerns, I use only the first name and last initial of the claimant in social security opinions.
[2] Martin O'Malley became the Commissioner of Social Security on December 20, 2023. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Martin O'Malley should be substituted for Kilolo Kijakazi as the defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

1

under the Act.³ *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; it consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (internal citations and alterations omitted); *see also Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (emphasizing that the standard for substantial evidence "is not high"). "In reviewing for substantial evidence, [the court should not] undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." *Mastro*, 270 F.3d at 176 (quoting *Craig*, 76 F.3d at 589). Nevertheless, the court "must not abdicate [its] traditional functions," and it "cannot escape [its] duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974). The final decision of the Commissioner will be affirmed where substantial evidence supports the decision. *Hays v. Sullivan*, 907 F. 2d 1453, 1456 (4th Cir. 1990).

In contrast, remand is appropriate if the Administrative Law Judge's ("ALJ") analysis is so deficient that it "frustrate[s] meaningful review." *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015) (noting that "remand is necessary" where the court is "left to guess [at] how the ALJ arrived at his conclusions"). The ALJ must sufficiently articulate his findings such that the district court can undertake meaningful review. *See Monroe v. Colvin*, 826 F.3d 176, 189 (4th Cir. 2016).

---

³ The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment, which can be expected to result in death or which has lasted or can be expected to last for a continuous period for not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Disability under the Act requires showing more than the fact that the claimant suffers from an impairment which affects his ability to perform daily activities or certain forms of work; instead, a claimant must show that his impairments prevent him from engaging in all forms of substantial gainful employment given his age, education, and work experience. *See* 42 U.S.C. §§ 423(d)(2), 1382c(a)(3)(B).

## CLAIM HISTORY

Ronald filed for Title XVI Supplemental Security Income benefits on January 25, 2021, with an alleged disability onset date of January 1, 2021. R. 15, 63, 170. Ronald's claims were denied by the Commissioner at the initial and reconsideration levels of administrative review. R. 78–82, 91–93. On April 5, 2022, ALJ Jeffrey Schueler held a telephonic administrative hearing to consider Ronald's claims. R. 36–62. Counsel represented Ronald at the hearing, which included testimony from Ronald and vocational expert Linda Dezack. *Id*. On June 13, 2022, the ALJ entered a decision analyzing Ronald's claims under the familiar five-step process[4] and denying his request for benefits. R. 12–34.

At the first step, the ALJ found that Ronald had not engaged in substantial gainful activity since January 25, 2021, the application date. R. 20. At the second step, the ALJ found that Ronald has the following severe impairments: hypertension, hepatitis C, mild cardiac dysfunction, dyspnea on exertion, post-traumatic stress disorder, depression, and anxiety. *Id*. As to the third step, the ALJ found that Ronald's impairments, either individually or in combination, did not meet or equal a listed impairment. R. 20–22.

The ALJ concluded Ronald retained the residual functional capacity ("RFC") to perform medium work except he is limited to simple, routine, repetitive tasks, in a work environment free of fast-paced production requirements such as assembly-line work (where the work of others is

---

[4] The five-step process to evaluate a disability claim requires the Commissioner to ask, in sequence, whether the claimant: (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals the requirements of a listed impairment; (4) can return to his past relevant work; and if not, (5) whether he can perform other work. *Johnson v. Barnhart*, 434 F.3d 650, 654 n.1 (4th Cir. 2005) (per curiam) (citing 20 C.F.R.§ 404.1520); *Heckler v. Campbell*, 461 U.S. 458, 460-62, 103 S. Ct. 1952, 76 L. Ed. 2d 66 (1983). The inquiry ceases if the Commissioner finds the claimant disabled at any step of the process. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The claimant bears the burden of proof at steps one through four to establish a prima facie case for disability. At the fifth step, the burden shifts to the Commissioner to establish that the claimant maintains the residual functional capacity ("RFC"), considering the claimant's age, education, work experience, and impairments, to perform available alternative work in the national economy. 42 U.S.C. § 423(d)(2)(A); *Taylor v. Weinberger,* 512 F.2d 664, 666 (4th Cir. 1975).

dependent on Ronald's actions), involving only simple, work-related decisions, few if any workplace changes, and occasional interaction with the public or coworkers. R. 22.

At the fourth step, the ALJ found that Ronald has no past relevant work. R. 27. At step five, the ALJ determined that Ronald could perform jobs that exist in significant numbers in the national economy, such as industrial cleaner, hand packager, and laundry laborer. R. 28. Thus, the ALJ concluded a finding of "not disabled" was appropriate. *Id*. Ronald appealed the ALJ's decision, and on January 27, 2023, the Appeals Council denied his request for review. R. 1–6. This appeal followed.

## **FACTS**

### A. Ronald's Background and Testimony

Ronald was born on September 17, 1960. R. 27, 41, 148. He has a GED certificate which equates to a high school education and he has taken some college level courses. R. 41, 170. The ALJ determined that Ronald does not have past relevant work as he testified that for the 23 years prior to his alleged onset date, he was incarcerated. R. 27, 41.

In his March 2021 function report, Ronald reported difficulty breathing and being unable to work or live as he had prior to his incarceration. R. 177. He stated that he is limited to walking about 15 minutes due to issues breathing and that he has to sit up in order to breathe which affects his sleep. R. 178. He can do household chores but is limited in his movement due to shortness of breath requiring him to take breaks in between activities. *Id*. He reported difficulties with postural movements, lifting, standing, and walking and estimated that he could walk about 100 feet or less before needing five to ten minutes rest. R. 182. He further reported that he loses his breath while standing, lifting, climbing stairs, bending, squatting, and kneeling. Id. He stated he has few issues with personal care, prepared meals daily, went outside daily, and shopped. R. 178–81.

4

At the April 3, 2022, hearing, as it relates to his physical impairments, Ronald testified that if he does anything strenuous, such as lifting, he experiences shortness of breath and chest pain. R. 42–43. He further testified that he is "not good" at carrying things that are heavy over a certain amount of feet. R. 57. He stated that he can "maybe" walk one block before needing to rest. R. 45. He also stated that he suffers from back pain, has difficulty standing for prolonged periods of time, has difficulty staying asleep, typically gets only about two hours of sleep per night, and suffers from fatigue. R. 46–48. He testified that he had no problem preparing his own meals or completing household chores, such as sweeping, dusting, or cleaning the kitchen. R. 54–55.

**B. Medical Treatment**

In rendering his decision, the ALJ reviewed medical records from Green Rock Correctional Center, Advanced Medical Consultants, Inc., Tri-Area Community Health Center at Ferrum, Lewis Gale Physicians, Blue Ridge Heart Care, and Franklin Memorial Hospital. *See* R. 234–357.

Ronald has a reported history of three sinus surgeries and facial reconstruction surgery following a motor vehicle accident. R. 300. He also has a history of back pain, hypertension, and hepatitis C. R. 304. In review of the medical records from Green Rock Correctional Center in 2020, Ronald consistently had sinus issues, for which nasal irrigation procedures were performed, and knee pain. R. 243, 255–57.

Following his release from incarceration in January 2021, Ronald had a medical appointment on April 28, 2021, with Beverly Davis, PA-C, to establish a primary care physician. R. 315–18. Ronald reported he had not seen a primary care physician for 23 years due to his incarceration. R. 315. At this appointment, Ronald denied chest pain, shortness of breath, headaches, and dizziness. *Id*. He reported that he "[d]oes stay active walking, but no regular cardio exercise." *Id*. On examination, he was in no distress, had clear lungs with no unlabored breathing

or wheezes, and normal extremities. R. 316–17. It was noted that Ronald has a history of hypertension that was "[c]ontrolled on current medication" and chronic hepatitis C without hepatic coma. R. 317.

On May 6, 2021, Ronald attended his initial behavioral health appointment with Christy Hensley, LCSW, for post traumatic stress symptoms. R. 313–14. He reported that he received training for multiple trades while incarcerated, was "currently doing various odd jobs" and was "determined to secure full time employment utilizing one of his trade skills." R. 313. Ms. Henley assessed Ronald to have post traumatic stress disorder and problems related to release from prison. R. 314. Ronald had follow-up appointments for his post traumatic stress disorder with Christy Hensley, LCSW on May 11, 2021, June 11, 2021, June 23, 2021, July 7, 2021, July 20, 2021. R. 298–99, 302–03, 307–12.

On May 8, 2021, Ronald attended a consultative examination with Morgan Jackson, PA, at the request of the agency. R. 285–90. Ronald reported fatigue and abdominal bloating, but provided he did not receive treatment for these symptoms. R. 285. He indicated being easily fatigued with exertion, and he tried to exercise but could not do very much due to his symptoms. *Id*. He further reported that he experienced swelling in feet and knees that "come and go" and shortness of breath when walking more than 100 feet. *Id*. When questioned about his activities of daily living, he stated that he was able to perform bathing, dressing, eating, cooking, cleaning, dishes, and vacuuming without any assistance. Id. Upon examination, Ronald was in no acute distress, was able to rise from the waiting room chair independently, was able to sit comfortably during the exam, was able to take off shoes and socks without assistance, and did not display shortness of breath. R. 286. He had clear lungs, a normal cardiovascular system, and no edema. R. 287. Additionally, he had intact cranial nerves, intact coordination, no issues with gait or station,

and full strength and reflexes in every muscle group. R. 287–88. He had a mild deficit in range of motion of his neck on rotation to the left, but otherwise normal range of motion of his neck, spine, shoulders, elbows, hands, hips, knees, ankles, and wrists. R. 288–89. His joints showed no deformity or swelling, his straight leg raise was negative, and he displayed no tenderness. R. 289. Morgan Jackson, PA, diagnosed Ronald with hepatitis and dyspnea on exertion. *Id*.

On June 25, 2021, Ronald presented for a physical with Beverly Davis, PA-C. He reported that he was "walking daily at least three miles." R. 304–06. Upon examination, he was in no acute distress, had a regular heart rate and rhythm, and no issues with his heart, lungs, extremities, and musculoskeletal and neurological systems. R. 305. He was advised to follow up in one week for the removal of a skin lesion. R. 306. On July 9, 2021, he attended the medical visit for the removal of the skin lesion. R. 300. Upon examination, he was in no acute distress and no other complaints or concerns were noted. *Id*.

On December 15, 2021, Ronald had a behavior health appointment with Christy Hensley, LCSW to follow-up on his mood symptoms, anxiety symptoms, post traumatic stress symptoms, divorce, and adjustment following 23 years of incarceration. R. 322–23. He reported that he was feeling depressed due to recently going through a divorce from his wife, experiencing severe anxiety with no way to "channel" it, and having sleeping problems. R. 322. He also reported that he was experiencing a lack of energy, was isolating himself at home, and recently went on a two-week "drinking binge" which was a bad experience. *Id*. Ronald was advised to follow up with his medical provider regarding psychotropic medications and to schedule a follow up appointment in two weeks. R. 323.

On December 20, 2021, Ronald had a follow-up appointment for hypertension with Beverly Davis, PA-C. R. 319–21. He reported that he "ha[d] been working out, walking, running,

and doing push-ups 5 days per week." R. 319. He also reported that he had "two episodes of non-exertional left-sided chest pain over the past few weeks" and that the "[e]pisodes last[ed] for several minutes," were "unprovoked," and "occur[ed] at rest." *Id*. On examination, his lungs, abdomen, and extremities were normal. R. 319–20. He had an irregular heartbeat, resulting in a diagnosis for "[a]trial fibrillation with normal ventricular rate," was referred to a cardiologist, and advised to follow up in six weeks. R. 320.

On January 17, 2022, Ronald was seen by Craig Turner, D.O., at Blue Ridge Heart Care. R. 348. He presented with complaints of shortness of breath at times, and occasional palpitations and chest pressure. *Id*. At this appointment, Dr. Turner ordered an echocardiogram and lexiscan which occurred in February 2022. R. 349. The results of the echocardiogram showed normal global left ventricular systolic function, a left ventricular ejection fraction of 55-60 percent, mildly abnormal left ventricular diastolic filling, mild mitral valve regurgitation, and mildly elevated pulmonary artery systolic pressure. R. 351. The results of the lexiscan were normal with a normal ejection fraction and no high-risk markers. R. 346, 357.

On March 17, 2022, Ronald met with Dr. Turner to review the results of his echocardiogram and lexiscan. R. 346–47. Dr. Turner assessed Ronald with essential hypertension, other chest pain, unspecified atrial fibrillation, shortness of breath, and paroxysmal A-fib. R. 346–47. Ronald was continued on Eliquis and he was prescribed gabapentin, verapamil, aspirin, and pantoprazole sodium. R. 347.

C. **Medical Opinion Evidence**[5]

Following the consultative examination on May 8, 2021, Morgan Jackson, PA, opined that Ronald could frequently lift up to 20 pounds and could never lift more than 20 pounds; could

---

[5] As Ronald's single assignment of error relates to the ALJ's assessment of his physical RFC, the undersigned limits its summary of the medical opinion evidence to the physical assessments.

frequently carry up to 20 pounds, could occasionally carry up to 50 pounds, and could never carry more than 50 pounds; could sit for eight hours, stand for about four hours, and walk for about four hours in an eight hour work day; could frequently reach, handle, feel, and grasp; and could occasionally bend, stoop, kneel, and squat. R. 289–90.

On May 20, 2021, state agency medical consultant William Rutherford, MD, reviewed Ronald's medical records and determined that he can occasionally lift and/or carry 50 pounds; frequently lift and/or carry 25 pounds; sit for about 6 hours in an eight-hour work day; and stand and/or walk for about 6 hours in an eight-hour work day. R. 66–67. He did not find that Ronald has any postural or manipulative limitations. R. 74–75.

On October 6, 2021, upon reconsideration, state agency medical consultant Robert McGuffin, Jr., MD, concurred with Dr. Rutherford's prior physical RFC assessment. R. 75.

## ANALYSIS

Ronald alleges that the Administrative Law Judge ("ALJ") erred in his determination of Ronald's Residual Functional Capacity ("RFC") in that he failed to properly consider the consistency of consultive examiner Morgan Jackson, PA's opinion with the evidence contained in the record, and failed to explain how the evidence detracted from Jackson's opinion. *See* ECF No. 13.

Because Ronald applied for benefits on or after March 27, 2017, the ALJ applied the new social security regulations for evaluating medical opinions. *See* R. 25–26. Under the new regulations, the ALJ may not "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s)." 20 C.F.R. § 404.1520c(a). Rather, the ALJ must consider the persuasiveness of all medical opinions in the record using five factors: supportability, consistency,

9

relationship with the claimant, specialization, and other factors that tend to support or contradict a medical opinion. *See* 20 C.F.R. § 404.1520c(c).

Although an ALJ may consider all five factors, the most important factors are supportability and consistency. 20 C.F.R. § 404.1520c(a), (b)(2). The supportability factor focuses on what the source brought forth to support his findings: "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) . . ., the more persuasive the medical opinions . . . will be." 20 C.F.R. § 404.1520c(c)(1). The consistency factor compares the source's findings to evidence from other sources: "[t]he more consistent a medical opinion(s) . . . is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) . . . will be." 20 C.F.R. § 404.1520c(c)(2). The ALJ must explain in his decision how he considered the supportability and consistency factors for each medical opinion in the record. 20 C.F.R. § 404.1520c(b)(2). The ALJ may, but doesn't need to, explain how he considered the other three factors. *Id*.

As always, the ALJ's decision must build an accurate and logical bridge between the evidence and the ALJ's conclusion that a medical opinion is or is not persuasive evidence of the claimant's allegedly disabling medical condition. *See Oakes v. Kijakazi*, 70 F.4th 207, 212–13 (4th Cir. 2023). When the court is "'left to guess' as to how the ALJ reached his evaluation of the conflicting medical opinions in light of the evidence of record," then it cannot review the reasonableness of his conclusions. *Testamark v. Berryhill*, 736 F. App'x 395, 398 (4th Cir. 2018).

Ronald argues that the ALJ's RFC determination is unsupported by substantial evidence as the ALJ failed to properly evaluate the opinion of the consultative examiner, Morgan Jackson, PA ("PA Jackson"), and failed to explain how the evidence of record undermined her opinion. ECF

No. 13, at 7–12. In short, Ronald claims that the ALJ simply stated his conclusion without creating a "logical bridge" between the evidence and his conclusion. *See* ECF No. 13, at 9; *Arakas v. Comm'r, Soc. Sec. Admin.*, 983 F.3d 83, 94 (4th Cir. 2020) (ALJs "must 'build an accurate and logical bridge' from the evidence to their conclusions."). The undersigned disagrees.

The ALJ found PA Jackson's opinion unpersuasive, specifically finding that the opined limitations are "not supported by the essentially normal examination findings by [PA Jackson]" and "not consistent with the generally normal primary care provider records or limited cardiology records." R. 26. Ronald does not challenge the ALJ's analysis of the supportability of PA Jackson's opinion, but argues the analysis of the consistency factor is not supported by substantial evidence.

The undersigned concludes the ALJ did not err in evaluating the consistency of PA Jackson's opinion. The ALJ concluded that PA Jackson's opinion was not consistent with "generally normal primary care provider records" or "limited cardiology records." R. 26. In support of this conclusion and in contrast to PA Jackson's medical opinion, the ALJ found that "[t]he record does not indicate [Ronald's] exertional abilities" are as limited as opined by PA Jackson, and that the record "does not establish upper extremity or postural limitations." *Id*. Although such statements are somewhat conclusory, "the ALJ need only review medical evidence once in [the] decision." *See McCartney v. Apfel*, 28 F. App'x 277, 279 (4th Cir. 2002). Specifically, prior to such statements and the ALJ's conclusion regarding PA Jackson's medical opinion, the ALJ thoroughly reviewed Ronald's medical record, his subjective statements, and state agency determinations. R. 23–25.

For example, the ALJ noted that in April 2021 during an appointment with his primary care physician, Ronald denied chest pain and shortness of breath, and stated he stayed active with walking but did not engage in regular cardiovascular exercise. R. 23. Further, the ALJ noted that

in May 2021 during the consultative examination with PA Jackson, Ronald had normal gait, full strength, good air movement in his lungs, and no wheezing. R. 24. The ALJ also noted that at his June 2021 physical, Ronald reported he was "walking daily at least three miles," denied joint pain, back pain and shortness of breath, and upon examination did not have musculoskeletal tenderness and had full strength and range of motion. R. 24. Additionally, the ALJ noted that in December 2021, Ronald denied dizziness, weakness, and edema, reported a new onset of dyspnea on exertion, and that he had been working out by walking, running, and doing push-ups five days a week, and on examination he had no respiratory abnormalities. R. 24. The ALJ also addressed the treatment notes from Ronald's cardiologist, along with Ronald's diagnosed mild cardiac abnormalities. R. 25–26. The ALJ further noted Ronald's treatment plan for his heart condition including his cardiologist prescribing multiple medications, a follow-up appointment in six months, and no noted limitations regarding his physical exertions. *Id*.

Further, in support of his conclusion that PA Jackson's opined limitations are unpersuasive, the ALJ discussed Ronald's medical treatment providing that Ronald "did not have respiratory abnormalities in [PA Jackson's consultative] examination" nor were they noted in the "primary care provider records." R. 26. The ALJ also noted that the medical evidence reflects Ronald has "mild cardiac abnormalities," but Ronald reported in December 2021 that he was "running and doing push-ups." *Id*. Ronald takes issue with this statement claiming that the ALJ failed to explain how this evidence detracts from PA Jackson's opined limitations. However, as argued by the Commissioner, further explanation is not necessary as the logical takeaway from such statement is that the ALJ concluded that Ronald's workout regimen is inconsistent with PA Jackson's limitations.

Lastly, Ronald argues that the ALJ's conclusion regarding the consistency of PA Jackson's opinion is flawed because the medical evidence is consistent with PA Jackson's opined limitations citing to selective portions of the primary care records and cardiology records. ECF No. 13, at 9–10. However, this Court is not tasked with reweighing the evidence and will not do so in this case. *See Mastro*, 270 F.3d at 176 (quoting *Craig*, 76 F.3d at 589) ("[The court should not] undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner].").

In summary, although the ALJ's analysis of PA Jackson's medical opinion was sparse, he appropriately evaluated the consistency factor in that he provided reasons, supported by the record, to conclude that PA Jackson's medical opinion is unpersuasive. Thus, the ALJ's explanation established the required logical bridge from the evidence to his conclusion.

## CONCLUSION

For the above reasons, it is **RECOMMENDED** that an order be entered **AFFIRMING** the final decision of the Commissioner and **DISMISSING** this case from the court's docket.

## Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the presiding District Judge.

The Clerk shall serve certified copies of this Report and Recommendation on all counsel of record.

Entered: February 21, 2024

*/s/ C. Kailani Memmer*

C. Kailani Memmer
United States Magistrate Judge